UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:20-CR-00015-JHM

UNITED STATES OF AMERICA                                                      PLAINTIFF

V.

ARTHUR J. ABBEDUTO                                                            DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Arthur Abbeduto's Motion to Suppress [DN 29]. The Court held two evidentiary hearings: March 18, 2021 and June 8, 2021. Fully briefed, this matter is ripe for decision. For the following reasons, Abbeduto's Motion to Suppress is **DENIED**.

### I. BACKGROUND

On July 19, 2019, a confidential source informed Detective Hinton and Detective Benjamin Fleury that Abbeduto "had a large or rather fruitful quantity of methamphetamine inside of his vehicle which was a white Dodge Ram pickup truck." [DN 39 at 5:6–15, 28:10–13]. The confidential source indicated that the truck "was leaving a home in the Tamarack-Apollo area." [*Id.* at 5:12–15, 28:13–14]. The confidential source is someone that Detective Hinton has worked with previously and considers reliable. [*Id.* at 4:22–24, 5:3–5].

Acting on the information from the source, Detective Hinton and Detective Fleury, went to investigate the tip by driving to the Tamarack-Apollo area to see if Abbeduto was there. [*Id.* at 5:16–20; 28:15–16]. As Detective Fleury was driving, they passed Abbeduto in his truck. [*Id.* at 5:21–25, 28:25–29:2]. On the way to the area, Detective Fleury contacted Deputy Russ Day who had a K-9 and asked for his assistance. [*Id.* at 6:6–11, 28:16–24, 40:10–16]. Based on

1

information from Detective Fleury regarding the general area where he and Detective Hinton would be, Deputy Day staged up at the parking lot of Apollo High School. [*Id.* at 6:9, 28:22–24, 40:12–18].

After the detectives passed Abbeduto, they turned around and drove behind him. [*Id.* at 6:13–14, 29:1–2]. The detectives observed Abbeduto get in the center lane without using his turn signal and then he turned into the parking lot of a gas station. [*Id.* at 6:17–18, 29:2–4, 29:18–21]. Detective Fleury turned on his lights and initiated the traffic stop. [*Id.* at 6:18–21, 29:4–5]. Abbeduto stopped his vehicle and pulled into a parking space at the gas station. [*Id.* at 7:16–19]. Then, Detective Hinton approached the driver's side of Abbeduto's truck to speak with Abbeduto, where he asked for Abbeduto's identification, told him why he was stopped, and asked him to step out of his truck. [*Id.* at 7:23–24, 10:16–21].

Detective Fleury called Deputy Day to inform him where they were located. [*Id.* at 29:6–8, 37:15–20, 40:20–22]. While Detective Hinton ran Abbeduto's information, Detective Fleury was speaking with Abbeduto. [*Id.* at 8:1–2, 10:23–25, 29:25–30:4]. Deputy Day pulled into the parking lot as Detective Hinton was checking for warrants. [*Id.* at 7:24–25]. Detective Fleury testified that Deputy Day arrived within a minute or two of Detective Fleury calling him. [*Id.* at 30:5–14].[1] Detective Fleury also testified that Detective Hinton was still conducting the license check when Deputy Day arrived; Deputy Day almost immediately began conducting the open-air sniff upon his arrival. [*Id.* at 30:15–25].[2] Consistent with Detective Fleury's testimony, Detective Hinton said that while he waited for a radio response on the check, Deputy Day did the open-air sniff. [*Id.* 8:17–20, 12:25–13:2]. When Deputy Day had his dog, Astro, do an open-air

---

[1] Consistent with Detective Fleury's testimony, Deputy Day testified that Apollo High School is about a mile to mile and a half away from the gas station and that it took him less than two minutes to get to the traffic stop. [DN 39 at 41:10–17].
[2] Deputy Day also testified that as he was walking toward Abbeduto's truck, he remembers that "Detective Hinton had a driver's license up in front of him and he was talking on his portable radio." [*Id.* at 41:5–7].

sniff around the truck, Astro gave a positive alert on the truck. [*Id.* at 8:9–11, 41:23–42:1]. The detectives then searched the truck and found methamphetamine. [*Id.* at 8: 12–16].

## II. DISCUSSION

### A. The Traffic Stop

Abbeduto argues that officers lacked probable cause when they stopped him. [DN 29 at 2, DN 52 at 3]. The United States responds that it had two independent bases for the stop: probable cause of a traffic violation and reasonable suspicion that Abbeduto possessed methamphetamine. [DN 33 at 1, DN 49 at 3–4].

The Fourth Amendment protects an individual from unreasonable searches and seizures. U.S. CONST. amend. IV. A traffic stop is seizure under the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citation omitted). Accordingly, any evidence that stems from an unreasonable search or seizure must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). Also, evidence that is later obtained from an initial unconstitutional search or seizure is generally inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488 (1963). In the Sixth Circuit, two separate tests exist "to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016) (citation omitted). The Court will consider the constitutionality of the stop for both probable cause for a traffic violation and reasonable suspicion that Abbeduto possessed methamphetamine.

*Probable Cause for the Traffic Stop.* "It is well-established that where an officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Winters*, 782 F.3d

289, 296 (6th Cir. 2015) (citation and internal quotation marks omitted); *United States v. Lambert*, 770 F. App'x 737, 739 (6th Cir. 2019) ("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction [for example, a traffic violation] or reasonable suspicion of criminal activity."). "Probable cause for a traffic stop is established when an officer observes a motorist violate a traffic law; the officer's subjective intent for making the stop is irrelevant." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (citation and internal quotation marks omitted)

      The detectives testified that they initiated the traffic stop because they observed Abbeduto failing to use a turn signal. Under Kentucky law "[a] person shall not turn a vehicle or move right or left upon a roadway until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided." K.R.S. § 189.380 (1)." Additionally, "[a] signal indicating the intention to turn right or left shall be given continuously for not less than the last one hundred (100) feet traveled by the motor vehicle before the turn." K.R.S. § 189.380 (2).

      Courts often find that failure to use a turn signal is sufficient to establish probable cause to justify a traffic stop. *See United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) ("A driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent."); *see also United States v. Townsend,* 305 F.3d 537, 541 (6th Cir. 2002) ("A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct."); *see also United States v. Matthews*, 422 F. Supp. 3d 1235, 1250 (W.D. Ky. 2019) ("[T]he officers had an appropriate basis for the stop regardless [of] their subjective motives because Gadegaard and Flynn observed Matthews turn into the apartment complex without activating his turn signal in violation of

Kentucky law."). Thus, the detectives' observation of Abbeduto failing to use a turn signal establishes probable cause that Abbeduto committed a traffic violation.

*Reasonable Suspicion that Abbeduto Possessed Methamphetamine.* The detectives also had reasonable suspicion that Abbeduto was engaged in criminal activity. "Reasonable suspicion is less demanding than probable cause, but is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (citation and internal quotation marks omitted). "An officer therefore must point to specific and articulable facts supporting his suspicion." *Id.* (citation and internal quotation marks omitted). "Whether there is reasonable suspicion depends on the totality of the circumstances . . . ." *Id.*

"A tip—anonymous or not—may furnish reasonable suspicion necessary to justify an investigatory stop." *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019) (citing *Alabama v. White*, 496 U.S. 325, 332 (1990); *Illinois v. Gates*, 462 U.S. 213 (1983)). "Such a tip must pass muster under *Gates*, which directs us to consider an informant's 'veracity,' 'reliability,' and 'basis of knowledge.'" *Keeling*, 783 F. App'x at 521 (quoting *Gates*, 462 U.S. at 230)). The subsequent corroboration of the tip and whether the tip is from a known or anonymous source are relevant factors too. *Id.*

"Evidence that an informant was known to the police and had provided reliable information in the past can establish a track record sufficient to show reliability." *Keeling*, 783 F. App'x at 522 (citing *Adams v. Williams*, 407 U.S. 143, 146–47 (1972)). "Independent corroboration of a tip further augments an informant's reliability." *Id.* (citing *Navarette v. California*, 572 U.S. 393, 398 (2014)).

Here, a confidential source informed law enforcement that Abbeduto had a large quantity of methamphetamine in his truck. [DN 39 at 5:6–11]. Detective Hinton testified that the confidential source is someone he had worked with previously. [*Id.* at 4:22–24]. Detective Hinton also had "previously taken efforts to investigate and corroborate information provided by that confidential source." [*Id.* at 4:25–5:2]. The confidential source is someone that his department deems to be reliable. [*Id.* at 5:3–5]. The detectives' subsequent investigation corroborated the confidential source's information because they located Abbeduto in the Tamarack-Apollo area in his pickup truck. [*Id.* at 5:6–6:4, 28:7–29:5]. Abbeduto argues that the detectives "did not believe the information [from the confidential source] was credible enough," but their testimony reveals that the opposite is true. [DN 52 at 4]. The evidence shows that the detectives had reasonable suspicion to stop Abbeduto for possession of methamphetamine.

### B. Was the traffic stop prolonged?

Because the use of the narcotics dog "does not itself raise Fourth Amendment concerns," Abbeduto "can only prevail by show[ing] that the officer no longer had reason to keep him where he was in order to conduct the dog sniff." *Winters*, 782 F.3d at 297 (citation and internal quotation marks omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed; whichever comes first." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (citation and internal quotation marks omitted). "Tasks ordinarily associated with a traffic stop that do not unconstitutionally extend a stop include checking identification, verifying registration and proof of insurance, and checking for any outstanding warrants on those in the vehicle." *Salas*, 820 F. App'x at 411 (citation omitted).

Deputy Day arrived about a minute or two after the detectives initiated the traffic stop because he was staged near the traffic stop. [DN 39 at 30:5–14]. Detective Hinton testified that he was still "effecting the course of the traffic stop" when Deputy Day arrived on scene to have Astro do an open-air sniff. [*Id.* at 8:5–7]. In fact, Detective Hinton testified that while he waited on information over the radio from the license check, Deputy Day was doing the drug sniff. [*Id.* at 12:19–13:2]. This is substantiated by Deputy Day's testimony that when he was walking toward Abbeduto's truck to do the open-air sniff, he remembers that "Detective Hinton had a driver's license up in front of him and he was talking on his portable radio." [*Id.* at 41:5–7]. Detective Fleury also testified that Detective Hinton was still conducting the license check when Deputy Day arrived on scene. [*Id.* at 30:15–19].

Abbeduto's arguments about whether the traffic stop was prolonged center around the Computer-Aided Dispatch (CAD) reports. [DN 52 at 5]. A CAD report is a computer-aided dispatch report that documents information that the dispatch center receives over the radio or telephone from law enforcement or people calling emergency services for help. [DN 47 at 5:8–16]. Abbeduto contends that the CAD reports do not corroborate the detectives and Deputy Day's testimony. [DN 52 at 5].

Abbeduto specifically takes issue with Detective Hinton's testimony that the call for the matter was created in the CAD report at 20:15:50; then, Detective Hinton, in explaining the CAD report, testified that at 20:15:54, the detectives had completed the stop and seized Abbeduto's vehicle. [*Id.* at 6]. But Detective Hinton made it clear that he does not work for dispatch, does not know what dispatch inputs, and he can only speak for he what he did. [DN 39 at 17:18–20]. Detective Fleury (who also does not have specialized training in dispatch) testified that at approximately 20:15:54 they had Abbeduto's vehicle stopped. [*Id.* at 31:10–13, 33:9–11]. Paul

7

Nave, Owensboro/Daviess County 911 Central Dispatch Director, testified that "ARR" status next to the 20:15:54 means that dispatchers were notified by officers that they had arrived [DN 47 at 8:5–12], which aligns with Detective Fleury's testimony about the CAD report. This testimony taken together means that the stop was not completed within 4 seconds (which both parties agree is impossible), but rather completed at some point between 20:15:54 when the vehicle was stopped and 20:44:06 when they were en route to the station.

      Abbeduto also questions Deputy Day's CAD report. [DN 52 at 9]. Deputy Day's CAD report shows an incoming call at 20:14:28 [DN 52-1 at 4], which Deputy Day says means that he "would have called central dispatch on [his] cell phone and said 'Open a K-9 request' and referenced back to the traffic stop at Carter Road and Tamarack." [DN 39 at 46:16–19]. Deputy Day testified that the did not start his CAD report "until probably after [he] already completed the search because [that] CAD is just a CAD for [his] records. It's a different CAD than what the detectives would have started when they made the traffic stop." [*Id.* at 45:16–19]. He further explained that he "would have probably just called 97, which is on scene, on [the detectives'] CAD report that they already had open as far as a traffic stop." [*Id.* at 45:21–23]. Notwithstanding the, at times, conflicting testimony from the officers about the CAD reports (who do not have specialized training in CAD reports), the evidence shows that Deputy Day's staging area at the high school was just a short distance away from the traffic stop location and the traffic stop was ongoing when he arrived. [*Id.* at 41:14–22]. The Court finds no reason to doubt the testimony of the officers regarding what happened during the traffic stop. The Court holds that the traffic stop was not unconstitutionally prolonged.

### C. Was there probable cause to search the vehicle based on the dog sniff?

"[A] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008). "In order for a dog's alert to support a determination of probable cause, 'the training and credibility of the dog must be established.'" *Id.* (citation and internal quotation marks omitted). "The government need not produce actual certification records to establish the reliability of the dog; testimony about the dog's training and reliability suffices." *Id.* (citation omitted). Deputy Day testified that both he and Astro received training for the detection of narcotics through the American Police K-9 Association. [DN 39 at 39:12–17]. Astro is qualified to detect marijuana, methamphetamine, heroin, cocaine, ecstasy, and MDMA. [*Id.* at 39:25–40:2]. Deputy Day explained that Astro's behaviors during the open-air sniff were consistent with Deputy Day and Astro's training and experience. [*Id.* at 42:14–16]. Thus, there was probable cause to search the truck based on Astro's alert.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Abbeduto's Motion to Suppress [DN 29] is **DENIED**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

August 3, 2021

cc: Counsel of Record